**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**DRIVES, INCORPORATED, Respondent.**

No. 18243.

United States Court of Appeals,
Seventh Circuit.

Jan. 20, 1971.

Rehearing Denied March 23, 1971.

sel, Nancy M. Sherman, Atty., N. L. R. B., Washington, D. C., for petitioner.

Mason Bull, Robert H. Potter, Bull, Ludens, Potter & Coplan, Morrison, Ill., for respondent.

Before SWYGERT, Chief Judge, and KILEY and STEVENS, Circuit Judges.

STEVENS, Circuit Judge.

The questions presented by the Labor Board's petition for enforcement are (1) whether its unfair labor practice findings are supported by the record, and (2) whether those findings adequately support the Board's conclusion that a bargaining order will better protect the employees' right of free choice than would an election. We have decided to enforce the Board's order with one modification.

## I.

Respondent has been engaged in the manufacture and sale of chains, augers, and related products in Fulton, Illinois, for about ten years. The size of its production and maintenance force increased from 58 employees in 1962 to 155 in 1966. In an election in 1962, 51 of the employees voted against the union.[1]

This proceeding arose out of the union's second attempt to organize the plant. On September 22, 1966, at least 84 employees had signed cards authorizing the union to act as their collective bargaining agent. On the basis of its majority status, evidenced by the cards, the union requested recognition. The company refused; referring to the "similar request" four years earlier, it suggested that the union ask the Labor Board for an electon. Before the refusal was received, the union had filed a petition for an election pursuant to § 9(c) of the National Labor Relations Act, 29 U.S.C. § 159(c). That petition was processed by the Regional Director of the Board's Thirteenth Region as representation case No. 38–RC–289.

Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet Prevost, Asst. Gen. Coun-

---

1. District No. 102, International Association of Machinists and Aerospace Workers, AFL–CIO.

On October 19, 1966, an Agreement for Consent Election was approved, and an election by secret ballot was set for November 4, 1966. On that date there were approximately 141 eligible voters in the bargaining unit, of whom 129 cast ballots. The union lost the election by a vote of 72 to 53, four votes having been challenged.

After the election, the union initiated unfair labor practice proceedings by filing a series of charges against the company. These charges were processed by the Board's General Counsel as complaint cases.[2] In addition, in the representation case, the union filed written "objections to conduct of employer which affected the results of the election"; based on those objections, the union requested that the election be set aside and that a second election be directed. Since certain common issues were raised by the challenge to the election in case No. 38–RC–289 and by the General Counsel's complaint, the proceedings were consolidated for hearings before the Trial Examiner. In his decision, the Examiner recommended (a) that the Regional Director set aside the election; and (b) that the Board entered a cease and desist order against the company, including a directive to bargain with the union.

The consolidated proceeding was then severed for further processing. In case No. 38–RC–289 the Regional Director accepted the Trial Examiner's recommendation and set aside the election. Pursuant to the Board's consent election procedures, that action is not appealable and is not before us for review.

In the severed complaint proceedings, the parties' exceptions to the Trial Examiner's decision were reviewed by a panel of the Labor Board. The Board modified the Trial Examiner's findings and recommendations in significant respects. Among the modifications was the rejection of the findings upon which the recommendation to the Regional Director that the election be set aside had been predicated. The Board nevertheless agreed with the Trial Examiner that the company should be ordered to bargain with the union.

At the time the bargaining order was entered, it was predicated on a finding that Respondent did not entertain a good faith doubt as to the union's majority status when it refused to recognize the union. *Cf.*, Joy Silk Mills, Inc. v. N. L. R. B., 87 U.S.App.D.C. 360, 185 F.2d 732, 741–742 (1950). Thereafter the Board changed its approach to bargaining orders and concluded that the existence or nonexistence of an employer's good faith doubt is "largely irrelevant" in determining the appropriateness of such an order. See N. L. R. B. v. Gissel Packing Co., 395 U.S. 575, 594, 89 S.Ct. 1918, 23 L.Ed.2d 547. The Board's rather dramatic abandonment of a traditional approach which it had used for many years had the effect of eliminating the predicate for the bargaining order which it had entered in this proceeding. Accordingly, it decided to re-examine its decision in the light of the Supreme Court opinion in *Gissel*.

On November 7, 1969, the Board issued a Supplemental Decision and Order, reaffirming the order it had originally entered on July 3, 1968. The critical portion of the supplemental decision reads as follows:

"We agree with the Trial Examiner that Respondent's refusal to recognize the Union violated Section 8(a) (5), and that an order to bargain is appropriate. In doing so, we find that Respondent's extensive unfair labor practices so diminished the possibility of ensuring a fair election that employee free choice is more effectively ascertained by the use of signed authorization cards than by an election. Further, in the circumstances of this case,

2. Case No. 38–CA–255 was predicated on a charge filed by the union on November 14, 1966, amended on November 29, and again on March 8, 1967. Case No. 38–CA– 305 was based on a charge filed by the union on March 19, 1967. The General Counsel's complaint issued on March 22, 1967.

where Respondent's unfair labor practices are of such pervasive character, an order to bargain would be an essential part of any remedial order, even absent an 8(a) (5) violation."

## II.

The unfair labor practices found by the Board included violations of §§ 8(a) (1), (2), (3), and (5) of the Act.[3] Respondent unquestionably wanted its employees to reject the union. To this end, it directed certain activities at the employees as a group and, in addition, supervisory personnel communicated directly with individual employees. The union's objections to the election were based entirely on Respondent's plant-wide conduct; the Board's order, however, rests primarily on individual incidents. We shall first summarize the individual matters and then discuss Respondent's plant-wide anti-union conduct. The discussion will identify evidence tending to support the Board's findings and may also indicate the extent to which the record establishes a causal connection between Respondent's unfair practices and the union's loss of the support of about 30 employees after cards were signed and before the election.

## A.

The Board found that six of Respondent's employees were victims of coercive or discriminatory conduct.

1. *Bernard Kostielney* was given a union card early in September. A few days later, while talking to the personnel manager about another matter, he was asked if he had signed a union card, and told that " * * * anyone caught signing them in the plant or distributing them out would be disposed of." The Board found that Bernard Kostielney was "interrogated" and "threatened" in violation of § 8(a) (1). At the time of the hearing in May, 1967, Kostielney was living in California (presumably having left Respondent's employ voluntarily).

2. *James Van Huizen* signed an authorization card and became an official union organizer on August 17, 1966. Some time in October, after refusing to discuss the union with another employee until after work, Van Huizen was approached by Foreman Shaver and told that "if I was talking union talk, I could be fired on the spot." He replied, "I know my rights."

3. *Blaine Kostielney* was one of the General Counsel's principal witnesses. He was first hired by the company in early 1966 and had quit and been rehired twice prior to August 17, 1966. Shortly thereafter he became a union organizer.

He had a number of conversations about the union with his immediate supervisor, Gib Van Dyke, early in September. In Kostielney's presence Van Dyke advised Pat Tadlock, another organizer, not to "let anybody catch you with those cards." About two weeks later, Van Dyke told Kostielney that the plant supervisor (Whitten) knew Kostielney had gotten his card from Pat Tadlock and "he was going to take care of it." In another conversation Van Dyke predicted that the employees would lose bonuses and make less money, and "that the company would probably close the doors, if the union got in." He also told Kostielney that Hogue (the personnel manager) and Whitten "knew who the instigators were and they'd get fired eventually." On that occasion Kostielney asked Van Dyke if he was going to be fired and was told "No, but if Whitten knew what I know about it, you'd get fired."

The Examiner found that these statements gave Kostielney the impression that the employees' union activities were under surveillance and concluded that giving such an impression was "violative of Section 8(a) (1) as it could inhibit the right of employees to pursue their union activities untrammeled by the fear of possible employer economic coercion or other forms of retaliation."

---

3. 29 U.S.C. §§ 158(a) (1), (2), (3) and (5).

On October 18 Kostielney asked Van Dyke for permission to attend a hearing that day in the labor representation proceeding. He had previously advised Van Dyke that he was a union organizer. Van Dyke took the request to the general foreman, Whitten, who stated that the union would have sent a letter asking for Kostielney if his assistance at the hearing was required; Whitten denied the request and further said that "anyone who left the plant today without a good excuse * * * would be fired." Kostielney had been given time off on many other occasions and there was no evidence that his presence in the plant on October 18 was required for production purposes. The Examiner concluded that the threat to fire Kostielney if he took time off to attend the hearing interfered with his § 7 rights in violation of § 8(a) (1).

On October 24 Kostielney was constructively discharged. The incident is the subject of conflicting evidence, but the Examiner was entitled to credit, as he did, the testimony that repeated contradictory orders and reprimands given to Kostielney by Van Dyke left him no choice but to quit. Even though he had voluntarily stayed home the preceding working day and grounds for discharge for cause existed, the record contains adequate support for the Board's finding that he was constructively discharged in violation of § 8(a) (3) and (1) of the Act.

At the time of the hearing in May, 1967, Kostielney was again working for Respondent.

4. *Larry Wintjen* also requested permission to attend the Labor Board hearing on October 18, 1966. Like Kostielney, he was advised that anyone who left the plant that day without a good excuse would be fired. He voluntarily quit a few days later.

5. *Patricia Tadlock* was hired by Respondent on June 13, 1966, attended a union meeting and became an organizer on August 17, and quit in October to go to work for General Electric. On February 10, 1967, she was laid off by General Electric and sought reemployment by Respondent. Although Respondent was suffering from a rapid turnover and was actively seeking employees, she was not rehired.

The personnel manager testified that he checked with her former supervisor (Van Dyke) who stated that he did not care to have Tadlock back. The Trial Examiner credited this testimony and found that the refusal to rehire her was not based on her union activities, but on her previously demonstrated dissatisfaction with her job. The Board concluded otherwise. Since the personnel manager's check with Van Dyke did not occur until more than a month after Tadlock's initial request for reemployment, and since other evidence indicated that Van Dyke's unfavorable recommendation was predicated on his knowledge of her union activities and the company's anti-union bias, the Board, without disagreeing with the Examiner's appraisal of the credibility of the personnel manager, held that Respondent's refusal to consider Tadlock for rehiring on and after February 10, 1967, violated § 8(a) (3) and (1).

6. *Leon Wynkoop* was involved in three incidents.

(a) In September, General Foreman Shaver, with whom Wynkoop was "real friendly," asked him how he felt about the union. In the conversation Shaver said that the majority of Respondent's business came from customers who counted on Respondent's ability to deliver without interruption by strikes because it was a non-union plant, and that if " * * * we were unionized * * * we would very likely lose those customers." The Examiner concluded that Shaver's statement, even in a friendly conversation, was coercive.

(b) During the lunch breaks there were quite a few discussions among the employees about the union. Following his return to work after one particularly heated discussion in which Wynkoop spoke in favor of organization, his foreman (Drury) approached him and said,

"I should watch myself or my news wouldn't be so good." When counsel asked if he continued talking about the union after that, Wynkoop answered: "Yes." The Examiner concluded that the foreman's statement was made at a time when Wynkoop was expecting a semi-annual wage increase and violated § 8(a) (1) because it was calculated to restrain Wynkoop's right openly to support the union.

(c) Wynkoop had worked in the Maintenance Department since 1961 and had received a wage increase of about ten cents an hour every six months. Based on past practice, such an increase would have been due on August 9, 1966, but was postponed because Wynkoop had been out sick for nine weeks. The nine-week postponement ended in October, but no increase was granted then because Respondent held up all such increases until after the election on November 4.[4] Promptly after the election Wynkoop again asked for his increase, but it was not granted until February of 1967. Although Wynkoop had no right to a periodic increase, the record supports the Examiner's conclusion that Respondent's denial of a wage increase for Wynkoop in November was in retaliation for being in favor of the union and, therefore, violated § 8(a) (3) and (1).

The Board ordered Respondent to make employeees Blaine Kostielney, Patricia Tadlock and Leon Wynkoop whole for any losses suffered by reason of the discriminatory discharge, refusal to rehire, and denial of a semi-annual wage increase, including interest on back pay and restoration of seniority status.

## B.

In addition to discrimination against the six individual employees, the Board considered several charges that conduct affecting the entire bargaining unit was unlawful. Apart from the refusal to bargain, which was found not to have been justified by a good faith doubt as to the union's majority status, the Board sustained only two of these charges. We shall discuss these two and then comment on Respondent's lawful conduct which may have persuaded some of its employees to vote against the union.

The Board found that Respondent illegally assisted a so-called "Advisory Board" in violation of § 8(a) (2), and that, shortly before the election, it made an implied promise to improve working conditions in violation of § 8(a) (1).

1. *The Advisory Board* was formed in 1961 and 1962 to take care of communications between the company and its employees. It consisted of elected employee representatives from each department and members of management. The employee members received their normal wages for attending Advisory Board meetings on company time, and were also paid $50 a year for serving on the board. The Advisory Board discussed the adequacy of plant facilities and working conditions. The Trial Examiner found that the Advisory Board was a labor organization within the meaning of the Act, that it had received improper support and assistance from Respondent, and that it should be disestablished. There was no contention that the Advisory Board influenced the outcome of the election.

2. *An Implied Promise of Benefits*, in the form of improved working conditions, was made by Respondent shortly before the election.

On October 21, two days after the agreement for an election was approved, Respondent mailed to its employees a form for a survey of their attitudes and opinions relating to their work. Specifically, the survey consisted of the employee's rating his supervisor, his working conditions, and his pay relative to other places of employment. Two questions dealt with employees' attitudes

4. Although the moratorium on wage increases in the Maintenance Department before the election might seem at least as significant as the individual denial in November, the union did not question the propriety of the pre-election moratorium.

toward a union. Employees were requested to return the completed survey to the plant and were cautioned not to sign the survey form or to indicate their identities in any manner. The letter accompanying the form stated that Respondent would study the results of the survey and "begin as rapidly as possible to make those improvements that the majority of you indicate should be made consistent with our financial ability to do so."

In a speech to the employees two days before the election Respondent's treasurer stated:

"Your comments on the new survey have pointed up some areas that perhaps we have not given enough thought to up until this time. We want to correct any conditions that bother you, and will do so as we have the money to make changes."

The Board found that the timing of the survey in relation to the election, together with the implied promise to improve working conditions, constituted unlawful interference with the rights of employees and was violative of § 8(a) (1) of the Act.

5. The objections which were withdrawn were:
"THIRD, the Employer posted printed anti-union material immediately next to the official Election Notices, along with a letter designed to appear as if the National Labor Relations Board sanctioned such articles and their contents. The Employer acted unlawful in posting such material next to the National Labor Relations Board Official Notice and by the contents of the material and its accompanying letter.
*      *      *      *      *
"FIFTH, the Employer unlawfully permitted its Quality Control Manager to attend all union organizing meetings.
"SIXTH, the Employer made a material misrepresentation of fact in its printed material to its employees when it accused the Petitioner of forcing the closing of specific companies in the area. It made this same misrepresentation in its captive audience meeting held on company time November 2, 1966."

6. "If we can't guarantee delivery to a customer, he will protect himself by spreading his business to several chain companies.

C.

On November 9, 1966, the union filed a petition requesting that the election be set aside and a second election directed. The union specified six objections to the conduct of the employer which affected the results of the election. Three of these objections were withdrawn prior to the hearing before the Trial Examiner.[5] The remaining objections were carefully considered by the Trial Examiner.

The union's first objection was that "the Employer held a captive audience meeting on Novmber 2, 1966, during which it stressed the idea that if the Petitioner became the bargaining representative, the Employer would be forced to go out of business." The Trial Examiner found that this objection was not supported by the evidence. In his speech at the meeting on November 2, Respondent's treasurer did stress the potential adverse business consequences of unionization, but did not go so far as to predict that the company "would be forced to go out of business." [6]

The union's second objection was perhaps its most serious. It was that " *   *

This could result in a 30% to 35% drop in production and in JOBS. If our orders go down, the number of weeks you get to work go down.
"We personally think that one of our competitors is responsible for the union trying to get into our plant. If the union can gain control of this place then this competitor will get some of our business. This hurts YOU. Clinton Engines at Naquoketa, Iowa had the same union that is trying to get in at this plant—today there are 800 people out of their jobs. Herman Nelson at Morrison, Illinois, had the same union that is trying to get in here—they too; are out of business. These two examples prove that this union cannot guarantee job security—only good management working with good employees can provide job security.
"We suggest that it's just good business to make it possible for us to say 'WE CAN GUARANTEE DELIVERY.' In other words, if you vote 'NO' in the election on Friday, we can say to our customers and employees on Monday * *. SURE, we can make delivery and SURE, we can give you regular steady employment."

the Employer distributed printed material to its employees which was designed to intimidate, coerce and threaten its employees by stating that the Petitioner forced two other area Employers out of business and would do the same to it. These letters also were designed to cause the employees to fear a loss of jobs and wages and cause them to believe that only strikes would result from a union victory on election day."

The Examiner sustained this objection on the basis of detailed findings, reviewing four written communications to the employees, as well as the text of the treasurer's speech on November 2. These communications stressed the potential impact of a strike on a small company and repeatedly mentioned two other plants which had gone out of business after being organized by the same union. The Examiner concluded that this "unremitting effort on the part of the Respondent to impress upon the employees the dangers inherent in their selection of the Union as their bargaining agent, particularly the danger of job loss, was not an attempt to influence the employees by reason, but was an appeal to fear." The Board, with one member dissenting, disagreed with the Trial Examiner. It concluded that the company's pre-election campaign did not create the impression that a strike was inevitable, but merely contained "predictions of possible economic consequences of the employees' selecting the union." It did not view such expressions of opinion as violative of § 8(a) (1).

The Trial Examiner had also sustained the union's fourth objection to the election, namely, " * * * that Employer unlawfully changed the employees' wage system and granted wage increases prior to the election for the purpose of influencing their vote." The Board found, however, (again with one member dis-

senting) that the company had announced its intention to initiate a wage incentive system prior to the union's organizational campaign. Although Respondent made several references to the plan during the pre-election campaign, the Board concluded that emphasizing a previously planned benefit was not unlawful.

Thus, of its six objections to the election, the union abandoned three, the Trial Examiner rejected another, and the Board concluded that the conduct challenged by the other two was not unlawful.

### III.

Respondent contends that the Board's findings are not supported by substantial evidence if the record is considered as a whole, *Cf.*, Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 491, 71 S.Ct. 456, 95 L.Ed. 456, and that the enforcement of a bargaining order in this case would improperly disenfranchise a majority of its employees. Neither argument is frivolous. We shall discuss (a) the sufficiency of the evidence of restraint or coercion of the § 7 rights of the six named employees; (b) the implied promise of benefits; and (c) the finding of violation of § 8(a) (5). We shall then consider the Board's remedy.

### A.

The evidence supporting the Board's findings of "threats," "interrogation," "coercion," "impression of surveillance," and "discrimination" involved six employees in a bargaining unit of about 150. The record does not indicate that any of them was actually intimidated or even discouraged from continuing to support the union openly prior to the election.[7] Moreover, when individual conversations are considered in the context of the entire organizing campaign,

---

7. Thus, after all of the "threats" and "interrogation" of Blaine Kostielney in September, on October 18 he asked for permission to attend the Labor Board hearing even though the union had not requested his appearance. Van Huizen's response to

Shaver's threat was "I know my rights." Wynkoop testified that he continued talking about the union after Drury threatened him. The other three employees all quit voluntarily.

their significance tends to diminish. During this period the union was probably the principal topic of conversation among the employees, and apparently junior supervisory personnel participated in some discussions more as equals than as representatives of management.[8] Some statements considered coercive by the Trial Examiner were hardly more than expressions of opinion.[9] In at least one instance the Trial Examiner's explanation for crediting an employee's testimony seems dubious.[10] The denial of the untimely request by two employees to attend a representation hearing was discriminatory only because Respondent had been so liberal in permitting employees to take time off in the past.[11] We, therefore, agree with Respondent that the whole record contains significant evidence which tends to undermine the Board's findings.

However, the evidence tending to support the Board's findings also derives added strength from a consideration of the entire record. Thus, the refusal to permit two employees to leave work in the middle of an afternoon shift to attend a representation hearing as mere spectators, standing alone, would have little, if any, significance.[12] Viewed in the context of the whole record, however, it was not unreasonable for the Examiner to infer that the refusal was motivated by Respondent's hostility to the union and interfered with rights protected by § 7 of the Act. Several significant factors emerge from a review of the entire case.

■ Respondent strongly opposed the organization of its production and maintenance personnel. It vigorously and effectively exercised its right to point out reasons why, in its opinion, unionization would be contrary to the interests of the employees. This it had a right to do.[13] But in Respondent's several communications to its employees there was a striking absence of any acknowledgment that the employees had an undisputed right to engage in collective bargaining activities, and there was an absence of any assurance to the employees that no matter how vigorously Respondent disagreed

8. Van Dyke was originally listed as a member of the bargaining unit. It is a fair inference from the record as a whole that the company sought to prevent union solicitation in the plant on company time and that some of Van Dyke's statements to Tadlock and Blaine Kostielney were more advisory than threatening in character.

9. Shaver's statement to Wynkoop that unionization might cause the company to lose business was considered coercive by the Trial Examiner, but was not substantially different from statements included in the treasurer's speech which the Board found permissible.

10. According to Bernard Kostielney, the threat made by Personnel Manager Hogue that "Anyone caught signing them in the plant or distributing them out would be disposed of" was also made by Foreman Wiebenga. There was no charge that Wiebenga's statement was unlawful and, therefore, no occasion for Respondent to call on Wiebenga to deny it. Yet the Trial Examiner relied on the failure to call Wiebenga as a reason for crediting Bernard Kostielney's testimony about Hogue's statement. Hogue denied talking to Kostielney about the union and was found to be a credible witness, but according to the Trial Examiner, he was less likely to remember a specific conversation with an employee than was the employee. As the personnel manager, however, Hogue certainly was aware of the significance of a threat to discharge an employee for union activity and, therefore, it is unrealistic to assume that he simply did not remember the threat if he really made it.

11. The Examiner's finding No. 5 states, in part, "It is undisputed that both Kostielney and Wintjen had on many other occasions requested time off and were never denied permission. This was the only time that permission was denied to either of them." However, the record does not indicate how frequently, if ever, either of them had come in at 1:15 P.M. and asked for the rest of the day off. Moreover, a liberal policy of excusing absences for reasons such as illness would hardly give an employee a right to absent himself at will.

12. See Standard Packaging Corp., 140 N.L. R.B. 628 (1963).

13. 29 U.S.C. § 158(c).

with the wisdom of supporting the union, the company would nevertheless respect its employees' rights and protect them from future retaliation.

Similarly, the record indicates that Respondent made no conscientious effort to require its supervisory personnel to avoid unfair comment or conduct.[14] The number of such personnel shown by the evidence to have acted unlawfully is itself significant. Even if individual statements by Van Dyke, Shaver, Drury, Hogue, Wiebenga and Whitten could be regarded as spontaneous expressions of their respective opinions, Respondent must be charged with responsibility for the aggregate impact of behavior which could have been prevented by effective management instruction and direction.

■ Of particular significance, in our view, is the timing of the § 8(a) (3) violations, each of which involved an employee active in the organizing campaign. We have carefully reviewed the evidence relating to each and are satisfied that the Board was warranted in finding that Blaine Kostielney was constructively discharged ten days before the election (and six days after he asked to attend the representation hearing); that shortly after the election Wynkoop was refused a wage increase which he would have received in the ordinary course; and that three months later Tadlock was not rehired even though her services were needed. Having concluded that these findings are supported by substantial evidence, we cannot disregard their importance as a part of the whole record.

Accordingly, although we may disagree with particular appraisals of the evidence, we have concluded that the Board's findings reflect a careful and impartial[15] consideration of the record, and that each of its findings of violation of § 8(a) (1), (2) and (3) is supported by substantial evidence.

#### B.

Respondent challenges the finding that it made an unlawful promise of benefits to its employees. It contends that the Trial Examiner found that its survey of working conditions was lawful and that statements that it intended to improve working conditions "as we have the money to make changes" were not promises. Although the facts disclosed by this record are distinguishable from the cases on which the Board relies, Respondent's argument must be rejected.

■■ It is unlawful for an employer to grant benefits during an organization campaign for the purpose of influencing the employees' selection or rejection of a union, even if the grant is unconditional. N. L. R. B. v. Exchange Parts Co., 375 U.S. 405, 409–410, 84 S.Ct. 457, 11 L.Ed. 2d 435. It is also unlawful to promise benefits to employees to induce them to abandon a union. Medo Photo Supply Corp. v. N. L. R. B., 321 U.S. 678, 685–686, 64 S.Ct. 830, 88 L.Ed. 1007. In this case, however, Respondent did not actually grant any benefits during the campaign,[16] and did not expressly promise to make any specific changes, or expressly state that any contemplated improvement was conditioned upon the outcome of the election.

Nevertheless, the Board drew inferences from Respondent's statements which were predicated largely on their relationship to the survey. The Trial Examiner found that the survey itself did not constitute unlawful interrogation. Contrary to Respondent's argu-

14. The company prepared and distributed a written set of instructions to guide its foremen and supervisors in discussions with employees about the union, but nothing more than a perfunctory attempt to procure observance of the guidelines appears to have been made.

15. As required by Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 492–497, 71 S.Ct. 456, 95 L.Ed. 456, we have taken into consideration the differences between the Trial Examiner and the Board, specifically including the fact that the Trial Examiner accepted Respondent's explanation for the refusal to rehire Tadlock.

16. The Board refers to certain improvements in the plant made shortly before the election, but the record indicates that these were part of a previously planned program.

ment, however, this finding did not prevent the Board from considering the survey and related statements together as employer conduct which implied that benefits would be granted if the union were defeated.

■ The survey was distributed about two weeks before the election. It requested employees to make specific suggestions for improvements in working conditions, implying that the company was ready, willing and able to make a tangible response to such suggestions. The statement that Respondent intended to make improvements as rapidly as possible included the condition "consistent with our financial ability to do so." That condition, read in the context of Respondent's other communications describing the possible impact of a union victory in the election, could properly be interpreted by the Board as implying that the benefits would only be granted if the union were defeated. The survey and related comments were, therefore, conduct implying a conditional promise of benefits rather than expressions of opinion protected by § 8(c). *Cf.*, N. L. R. B. v. Flomatic Corp., 347 F.2d 74, 76–77 (2d Cir. 1965).

Respondent argues that the modern working man is too sophisticated to be influenced by such campaign promises on the eve of an election. No doubt there is considerable force to this argument. However, the same argument could be directed at the whole doctrine of treating the grant or promise of benefits during an organizing campaign as an unfair labor practice.[17] In our opinion, the conduct of Respondent, described by the Board as an implied promise of benefits, is governed by the rationale of N. L. R. B. v. Exchange Parts Co., 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435. *Cf.*, L. C. Cassidy & Son, Inc. v. N. L. R. B., 415 F.2d 1358, 1360–1361 (7th Cir. 1969).

### C.

■ The fact that the union had a card majority on September 26, 1966, when Respondent rejected its demand for recognition, is not, in itself, sufficient to establish a violation of § 8(a) (5). At that time Respondent had a legal right to insist upon a secret ballot election and, further, to try to persuade its employees, including those who had signed cards, to disavow the union. This much is clear.[18]

Respondent's conduct prior to the election included both unlawful practices and lawful speech. Before the decision in *Gissel*, the former were treated, somewhat illogically,[19] as proving the absence of a good faith doubt as to the union's majority status, and hence that the refusal to bargain violated § 8(a) (5). As we understand the Supreme Court's opinion in *Gissel*, a different analysis is now required. The employer's subjective motivation is no longer of controlling importance. Instead, attention must be focused on the causal relationship between the unfair practices and the election process.[20]

In this case neither the Trial Examiner nor the Board made any detailed analysis of the causal connection between Respondent's unfair labor practices and

---

17. Bok, The Regulation of Campaign Tactics in Representation Elections Under The National Labor Relations Act, 78 Harv.L.Rev. 38, 112–116 (1964).

18. "Thus, an employer can insist that a union go to an election, regardless of his subjective motivation, so long as he is not guilty of misconduct; he need give no affirmative reasons for rejecting a recognition request, and he can demand an election with a simple 'no comment' to the union." N.L.R.B. v. Gissel Packing Co., 395 U.S. 575, 594, 89 S.Ct. 1918, 1930, 23 L.Ed.2d 547; see also H.R. Rep. No. 245, 80th Cong., 1st Sess. 30; 29 U.S.C. § 158(c).

19. See N.L.R.B. v. James Thompson & Co., 208 F.2d 743, 746 (2d Cir. 1953).

20. The Court indicated, by quoting from the Board's brief, that "unfair labor practices likely to destroy the union's majority and seriously impede the election" will establish a § 8(a) (5) violation. 395 U.S. at 600, 89 S.Ct. at 1933. Earlier, in describing the Board's practice, the Court stated " * * * and the key to the issuance of a bargaining order is the commission of serious unfair labor practices that interfere with the election processes and tend to preclude the holding of a fair election." 395 U.S. at 594, 89 S.Ct. at 1930. And later it considered

the union's loss of the election. The Trial Examiner's conclusion that Respondent had violated § 8(a) (5) was predicated on his finding that Respondent did not entertain a good faith doubt as to the union's majority, and the Board, in its post-*Gissel* supplemental decision stated that it agreed with the Trial Examiner that Respondent had violated § 8(a) (5). The Board directed no attention to the possibility that Respondent's employees might well have voted to reject the union even if Respondent had not committed any unfair labor practices. It made no finding that Respondent's unfair practices had an actual impact on the election.[21]

Based on our review of the record, we have concluded that the actual effect of Respondent's pre-election violations may have been relatively minor compared with the probable impact of the arguments to which the union strenuously objected in its election challenge. Promptly after the election, the union, which presumably had firsthand information about the principal reasons for its defeat, objected to specific conduct of the employer as unfairly affecting the election. The union objections included no reference to any of Respondent's unfair labor practices. On the contrary, the union's challenge was directed solely at employer conduct which the Board ultimately found permissible. In the election campaign Respondent had repeatedly pointed out that two small companies which had previously been organized by the same union were no longer in business. It argued that its non-union status gave it a sales advantage over larger competitors, which in turn enabled it to provide job security. And it made other permissible arguments that may well have convinced men who had signed authorization cards before listening to both sides of the discussion to change their minds.

In our judgment it is entirely possible that a majority of Respondent's employees would have voted against the union on November 4, 1966, even if Respondent had been guilty of no wrongdoing. In these circumstances, even though we recognize that the "tendency" of unfair practices to affect the election process, rather than proof of actual impact, may be sufficient to sustain a finding of violation of § 8(a) (5), we have decided to reject that finding in this case. To use the evidence that was presented and evaluated under the "good faith doubt" standard to achieve the same result under a different label, without first considering the interests of a substantial number of employees who opposed the union, would disregard the force of the arguments that led to the demise of the "good faith doubt" test.[22]

the propriety of a bargaining order as a remedy " * * * where an employer has committed independent unfair labor practices which have made the holding of a fair election unlikely or which have in fact undermined a union's majority and caused an election to be set aside." 395 U.S. at 610, 89 S.Ct. at 1938.

21. Compare the finding in this case quoted at pp. 3–4 with the Board's unequivocal language in *Sinclair*: "To the extent that the election revealed a loss of union support thereafter, such loss must be found attributable to the Respondent's unfair labor practices." 164 N.L.R.B. 261, 269 (1967). *Cf.*, N.L.R.B. v. Wylie Mfg. Co., 417 F.2d 192, 196 (10th Cir. 1969).

22. The Board's abandonment of the *Joy Silk* doctrine was announced at oral argument of the *Gissel* cases and may have been prompted by the severe criticism of the "good faith doubt" test on behalf of union and employer parties who had contended that an employer's subjective motivation at the time of his refusal to bargain was irrelevant in a proceeding to determine whether his employees should be free to choose or to reject the union as their collective bargaining agent. See 395 U.S. at 594, 89 S.Ct. 1918; Brief for Food Store Employees Union, Local 347, in Nos. 573 and 691, O.T.1968, pp. 77–83; and Brief for Heck's Inc., in No. 573, O.T.1968, pp. 34–35. If employer motivation *is irrelevant, why* should employer misconduct be controlling if it does not actually influence the employees' choice?

Formerly violations of §§ 8(a) (1), (2) and (3), if sufficiently serious, established a lack of good faith doubt, which in turn established a violation of § 8(a) (5), and therefore justified the entry of a bargaining order. At the oral argument of *Gissel* the Board eliminated one step in the sequence because the employer's subjective motivation has little bearing on the employees' interests which the statute is intended to protect. In the Board's post-*Gissel* finding in this case, the element of "good faith doubt" has been eliminated from the sequence, but otherwise it remains the same: violations of §§ 8(a) (1), (2) and (3) are relied on to establish a violation of § 8(a) (5), and accordingly a bargaining order is entered. Again, however, the result is reached as between union and employer with little or no attention focused on the interests of employees. On this record, we prefer to reject the finding of violation of § 8(a) (5) completely and to address ourselves directly to the question whether a bargaining order is an appropriate remedy for Respondent's unfair labor practices, assuming it lawfully rejected the union request for recognition on September 26, 1966.

### IV.

■ There is no question about the validity of the cards obtained by the union before it made its request for recognition. The union was not accused of any unfair practices and the cards were simple and unequivocal in form. Even though authorization cards may not give rise to an immediate duty to bargain, they are acceptable evidence of the union's authority in this proceeding. N. L. R. B. v. Gissel Packing Co., 395 U.S. 575, 601–609, 89 S.Ct. 1918, 23 L.Ed.2d 547. This case, therefore, involves the entry of a bargaining order in favor of a union which had a majority status when it

made its demand. Accordingly, even absent a § 8(a) (5) violation, the Board's power to enter the order is settled.[23]

The union's demand was made over four years ago. In the interim it lost a secret ballot election, it has no doubt suffered further attrition since it has been unrecognized during this period, and there has probably been a continuing turnover of personnel. We assume, therefore, that the union does not now represent a majority of the employees. Since a primary goal of the statute is the protection of employee free choice, and the secret ballot election is the favored method of ascertaining that choice, the arguments against the entry of a bargaining order are obvious and substantial. There are, however, countervailing factors to consider.

■ Regardless of their actual impact on the outcome of the election, Respondent's unfair labor practices were serious, and an order which will effectively discourage their repetition should be adopted. The delay occasioned by the unfair labor practice proceeding should not prejudice the union's position. Otherwise, instead of a deterrent, the administrative process would provide a reward for employer misconduct. Franks Bros. Co. v. N. L. R. B., 321 U.S. 702, 704–705, 64 S.Ct. 817, 88 L.Ed. 1020; N. L. R. B. v. Katz, 369 U.S. 736, 748 n. 16, 82 S.Ct. 1107, 8 L.Ed.2d 230. Nor, as *Franks* squarely holds, is the fact that the union may not represent a majority of the employees when the bargaining order is entered a fatal objection to such a remedy. As between the union and Respondent, the "strong medicine" of a bargaining order is a proper cure. See N. L. R. B. v. Flomatic Corp., 347 F.2d 74, 78 (2d Cir. 1965).

■ The interests of the employees do not necessarily parallel the union's and, therefore, should be separately con-

---

23. N.L.R.B. v. Wylie Mfg. Co., 417 F.2d 192, 196 (10th Cir. 1969); see N.L.R.B. v. Dan Howard Mfg. Co., 390 F.2d 304, 309 (7th Cir. 1968). In *dicta*, the Supreme Court suggested the possibility that a bargaining order might be appropriate in an exceptional case even though the union never represented a majority, see 395 U.S. at 613–614, 89 S.Ct. 1918, but no such case appears to have been decided.

sidered.[24] Under the *Gissel* test, the evaluation of Respondent's unfair labor practices is not merely a determination of whether employer misconduct actually caused the union to lose the election. 395 U.S. at 591, 594, 595, 614, 89 S.Ct. 1918. Of greater importance is the impact on the possibility of a fair rerun. In this light, the significance of some of Respondent's practices almost vanishes, whereas the importance of others is dramatically increased.

The cease and desist order disestablishing the Advisory Board would eliminate any likelihood that Respondent's violation of § 8(a) (2) would preclude the holding of a fair rerun. Similarly, the fact that campaign promises of benefits are probably evaluated in their historical context militates against attaching undue weight to this interference with the employees' ability to express their choice independently.

An entirely different appraisal of Respondent's pre-election threats is warranted by its post-election conduct. Whereas before the election vague comments about the possibility of discharge might have been disregarded or freely challenged by courageous employees, they would be remembered with real concern if Respondent's post-election conduct included actual retaliation against active union adherents. For that reason we attach particular significance to Respondent's post-election violations of § 8(a) (3). Discriminatory retaliation against union supporters a week and even months[25] after the company's victory is surely a serious unfair labor practice tending to prejudice a fair rerun. Regardless of whether Respondent's discrimination against union adherents continued beyond February, 1967, or affected more than the specific employees identified in the record, the Board was entitled to conclude that the character and timing of these violations, against the background of earlier misconduct, materially diminished the possibility that a second election could be fairly conducted. This case is within the *Gissel* test for the issuance of a bargaining order.

In *Gissel* the Supreme Court specifically considered the fact that a bargaining order may disenfranchise a majority of the employees. It discounted the significance of this possibility because the disenfranchisement is not necessarily permanent. 395 U.S. at 613, 89 S.Ct. 1918. After the bargaining relationship has been established and permitted to function for a reasonable period in which it has had a fair chance to succeed, the employees have a statutory right to reject the union by petitioning for a secret ballot election. 29 U.S.C. § 159(c) (1) (A); Franks Bros. Co. v. N. L. R. B., 321 U.S. 702, 705–706, 64 S. Ct. 817, 88 L.Ed. 1020. It is the existence of this statutory protection of the employees' right of free choice that enables us to approve of an order directing Respondent to bargain with a union which probably represents less than half of its employees. Yet we wonder how many employees are aware of the existence of this seldom invoked right.

In this case, in view of the rejection of the union by Respondent's employees by a vote of 72 to 53, together with the fact that this rejection may not have been affected by Respondent's pre-election misconduct, it is of more than usual importance that the employees accurately understand their right to request a secret ballot election. They should not be required to rely either on the union or on Respondent for an explanation of this right. We, therefore, have decided that the Board's order should be modified to include provision for a notice to the employees advising them of their independent right to petition for a new election. *Cf.*, N. L. R. B. v. Priced-Less Discount

---

24. See Medo Photo Supply Corp. v. N.L. R.B., 321 U.S. 678, 695, 697, 64 S.Ct. 830, 88 L.Ed. 1007 (Rutledge, J., dissenting).

25. In the normal course, Wynkoop would have received a wage increase in November, if not before; it was not forthcoming until February. In March Respondent refused to rehire Tadlock.

Foods, Inc., 405 F.2d 67, 71–72 (6th Cir. 1968); 407 F.2d 1325 (1969). The exact terms of the notice, including the specification of the time when an employee petition may be filed, we leave to the discretion of the Board.

As so modified, the order will be enforced.