**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**DAN HOWARD MFG. CO. and Dan Howard Sportswear, Inc., Respondent.**

**No. 16154.**

United States Court of Appeals Seventh Circuit.

Jan. 12, 1968.

Rehearing Denied Feb. 12, 1968.

---

Marcel Mallet-Prevost, Asst. General Counsel, Harold B. Zanoff, Atty., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Lawrence M. Joseph, Atty., N.L.R.B., Washington, D. C., for petitioner.

Philip D. Goodman, Chicago, Ill., for respondent.

Before KILEY, SWYGERT and CUMMINGS, Circuit Judges.

KILEY, Circuit Judge.

The Labor Board found[1] respondent (Company) guilty of violating Sec. 8(a) (1) and Sec. 8(a) (5) of the National Labor Relations Act, 29 U.S.C. § 151 et seq., in interrogating, threatening, etc., employees, and in refusing to bargain with the Union.[2] The Board has petitioned for enforcement of its order that the Company cease and desist from the unlawful activity, post appropriate notices, and bargain collectively with the Union. We enforce the order with respect to the 8(a) (1) violation, but deny enforcement of the order to bargain with the Union.

The Company manufactures maternity clothing in Chicago, Illinois. The Union began an organizational campaign among the Company's production and maintenance employees in November, 1964, and claimed a majority on November 24, 1964. The Company answered December 3 that it was advised a representative election should be held to determine a majority. On December 28 the Union filed a petition with the Board for an election, and, on January 5, 1965, the Company consented to an election to be held January 21, 1965. On January 6, 1965, the Union formally demanded recognition as bargaining representative of the unit employees "notwithstanding the * * * election." It offered to submit its claimed majority of authorization cards to a verification check. The Company did not respond to the demand. The Union lost the January 21 election 28–16. The Union filed with the Board an objection to the election and a complaint charging various unfair labor practices by the Company. The Regional Director ordered the objections and charges consolidated for hearing upon the Trial Examiner's recommendation. After the hearing the election was set aside.

At the hearing several employees testified that during the campaign before the election the Company's co-owners Leibach and Kirsch interrogated them about the Union campaign, about who had signed cards, who was and who was not for the Union, and how the employees felt about the Union; and who was at a pre-election Union meeting. Leibach and Kirsch did not deny having conversations at the time the employees said they were had, but denied generally the improper interrogations. Kirsch specifically de-

---

1. The Board disagreed with the Trial Examiner's finding in minor respects, unimportant here.

2. International Ladies Garment Workers Union, AFL–CIO.

nied making statements to employees about getting rid of the employees who "were behind all of this," and the Union might ask for things the Company could not pay and "would have to close up."

■ The conflicts in the evidence were resolved against the Company, and we are bound by the credibility decisions of the Trial Examiner, adopted by the Board. We think the Examiner was not required to believe Leibach was merely making the reasonable oral verification of majority status, contemplated in International Ladies Garment Workers' Union, AFL-CIO v. N.L.R.B., 366 U.S. 731, 739, 740, 81 S.Ct. 1603. The Company was guilty of unlawful interrogation in this respect. This conclusion is not affected by the validity or invalidity of the Board's finding that the Union had a majority on January 6, 1965. Interference (Sec. 8(a) (1)) is not determined by success or failure of the Union drive.

■ We see no 8(a) (1) violation in an employer's speech which the Board argues carried a threat of the probability of a layoff should the Union be chosen. The reference was to a Union promise to the employees of a thirty-five hour, instead of a forty hour, week. The speech told the employees that if a thirty-five hour week was adopted the Company would likely employ more girls to do the work, as other shops had done, rather than pay time-and-a-half for overtime. We cannot accept this response to the Union promise as instilling in the employees "a fear of economic loss" interfering with Sec. 7 rights by threatening a layoff. R. R. Mallory & Co., Inc. v. N.L.R.B., 389 F.2d 704 (December 26, 1967) (7th Cir.). The speech in N.L.R.B. v. Nabors, 5 Cir., 196 F.2d 272, 274, justified the inference of violation there.

■ There is a substantial basis in the evidence for the Board's conclusion of 8(a) (1) violations in that the Com-

pany imposed a general no solicitation rule on the shop which was discriminatorily enforced against pro-Union employees by permitting others to solicit anti-Union "votes"; and that employee White in solicitation of anti-Union "votes" was acting for the Company. The question of employee White's agency was one of credibility. There is substantial evidence in the light of the Company's concurrent unlawful interrogation and discriminatory enforcement of the "no solicitation" rule to support an inference that the Company, after the Union demanded recognition, interfered with employee organizational rights by denying customary employee wage increases, despite the Company's claim that this was done on the advice of counsel that to grant the increases would be an unfair labor practice. The Trial Examiner could well infer on. the record that but for the organization campaign the raises would have been given and that the motivation was anti-Union bias resulting in violation. Federation of Union Rep. v. N.L.R.B., 2 Cir., 339 F.2d 126, 129.

We hold that the record substantially supports that Board's decision that the Company violated 8(a) (1) by its interrogation of employees, by imposition of the discriminatory no-solicitation rule and by the withholding, on pretext that it would be an unfair labor practice, of customary employee raises.

■ The representative unit consisted of forty-five employees.[3] Before the Examiner the Board's General Counsel presented twenty-eight signed authorization cards in support of the 8(a) (5) violation charge. The cards are unambiguous and freely authorize the Union to "act exclusively as my * * * representative * * * for the purpose of collective bargaining." The Company challenged ten of these cards, the Examiner sustained objections to four, and the Board approved his decision. As it

---

3. Toby Kirsch was excluded by the Examiner from the unit. She is the mother of one of the two owners of the Company. She worked shorter hours and was paid nearly twice as much as the other employees in similar positions. She had no community of interest with the others in the union and was properly excluded.

now stands, the Union holds twenty-four valid cards, a majority of the forty-five members of the unit. In this court the Company challenges six of the twenty-four cards. If two of the cards are invalidated the Union will lose its majority status. The cards challenged were signed by employees Wilson, Brown, Burdette, Cole, Pate and Smith.[4]

We think the Board erred in adopting the Examiner's decision that the cards signed by employees Brown and Burdette were valid. In our opinion the record compels the conclusion that those two cards are invalid.

There is no question of credibility involved in our decision as to the validity of these cards, since the Examiner credited the testimony of both employees involved. The Examiner's error was in applying an erroneous rule of law with respect to each of the two employees.

■■■ The Examiner found that Union Agent Weiner misrepresented to employee Brown that a majority of employees had signed cards. He concluded however that because Brown did not make an effort to check the truth of Weiner's statement, the card "should be counted."

The Examiner acknowledged that if the holding in N.L.R.B. v. H. Rohtstein & Co., 1 Cir., 266 F.2d 407, controlled, the card was invalid. The holding in *Rohtstein* is that where an employee signs an authorization card in reliance upon a union agent's misrepresentation that a majority of employees had signed cards, the card is invalid, at least when the employee cannot readily check the truth of the statement.

The testimony of the colloquy between Mrs. Brown and Weiner before the card was signed discloses that she was induced by him not to check with the "old girls" before signing.[5] And clearly she relied

upon the misrepresentation about the majority when she signed, "to get rid" of Weiner before knowing anything about the Union. We find nothing in the factual situation before us that would indicate that the employee here could have determined the truth of the organizer's statement any more readily than could the employee in *Rohtstein*. We follow the *Rohtstein* holding as being the wholesome rule tending toward a more forthright solicitation of authorization cards.

■■■ We think the record also compels a conclusion that the Burdette card is invalid. The Board erroneously adopted the Examiner's decision with respect to this card again because of an incorrect view of the law. The Examiner credited employee Burdette's testimony that she signed the card under the mistaken impression that its sole purpose was to admit her to a meeting. This he decided did not invalidate the card, since he could find no "misrepresentation" on the basis of Burdette's testimony. The Burdette testimony in our view supports only the inference that she was told the card was meaningless and was led to believe that it was for attendance at a union meeting and for an opportunity to vote in a representative election.[6] The fact that the language of the card was unambiguous is of little significance in light of her testimony as to her conversation with Weiner and her testimony that she did not read the card nor did anyone read it to her.

The attorneys at the hearing, and the Examiner in his opinion, assumed that the "sole purpose" rule announced in N.L.R.B. v. Cumberland Shoe Corp., 6 Cir., 351 F.2d 917, required the use of the exact word "sole" or "only" by the organizer, when he represented that the purpose of the authorization card was to secure an election, in order to invali-

---

4. We note here this court's dissatisfaction with the Joint Appendix filed in this case. The choppy presentation of questions and answers, leaving gaps unconnected by any bridge of reference between segments, has been of no use on the card

issue. We have read the record testimony.

5. See Appendix to this opinion for excerpts of testimony.

6. See Appendix to this opinion for excerpts of testimony.

date the card, and that this mechanical rule was the proper guide in determining card validity. The attorneys sought to elicit from employees by leading questions whether or not it had been stated that the "sole purpose" of the card was an election, i. e., whether the word "sole" or "only" was actually used; and the Examiner similarly assumed one of those words was needed. Recently the District of Columbia Circuit in N.L.R.B. v. Preston Products, 392 F.2d 801 (December 14, 1967), cited and purported to follow the Cumberland rule, interpreting that rule as mechanically requiring the use of the word "sole" or "only." The Second Circuit in N.L.R.B. v. S. E. Nichols Co., 380 F.2d 438, interpreted *Cumberland* in the same manner as did the court in *Preston,* but refused to follow *Cumberland* so interpreted. It held invalid authorization cards where procured by misrepresentations that gave employees the impression that they would have a right to vote on the Union and that their signature on the card was not a designation of the Union as their bargaining agent.

In the recent case of N.L.R.B. v. Swan Super Cleaners, 384 F.2d 609 (October 25, 1967), the Sixth Circuit, through Judge O'Sullivan, explained its decision in *Cumberland,* expressly disavowing the view that *Cumberland* held that the very word "sole" or "only" was needed to invalidate a card. The court adhered to *Cumberland,* saying that its rule is not offended by invalidating cards, no matter what style or wording was used by the organizer "if it is clearly calculated to create in the mind of the one solicited a belief that the only purpose of the card is to obtain an election." The court pointed out that it is relevant to consider the subjective intention of the signer and his expressed state of mind in deciding whether a misapprehension was knowingly induced.

We apply the restatement in *Swan* of the *Cumberland* rule and hold that "in its total context" the only reasonable inference that can be drawn from the Weiner-Burdette colloquy, as testified

to by her, is that statements made by Weiner created in Burdette's mind a misapprehension as to what signing the card meant and that her signature on the card did not represent an intention to designate the Union as her bargaining agent. We do not view this as a departure from the holding in Happach v. N.L.R.B., 7 Cir., 353 F.2d 629, a case relied on by the Board, since we interpret *Happach* in the same manner as the Sixth Circuit interpreted *Cumberland* in its opinion in the *Swan* case.

We hold both cards are invalid, there was no Union majority when recognition was requested, and no 8(a) (5) violation in not responding to the request. We need not therefore pass on the issue of "good faith" in refusing to bargain. The 8(a) (1) violations present here are concededly insufficient to support a bargaining order under the circumstances of this case.

The portion of the order based on the 8(a) (1) violation will be enforced; and enforcement of the portion of the order based on the finding of an 8(a) (5) violation including the bargaining order will be denied.

## APPENDIX

5. Excerpts of testimony of Brown:

Q. And, Mrs. Brown, I hand you a document which is in evidence in this hearing as General Counsel's Exhibit 7y and ask you to examine it if you will, please. Does the signature of Georgia Brown appearing on the card, is that your signature?

A. Yes.

Q. And was it signed by you on or about the date that the card bears, shown as November 25th?

A. Yes.

Q. Now, will you tell us who gave you the card.

A. Mordecai.

Q. Mordecai Weiner?

A. Weiner, yes.

Q. Did you have a conversation with him [Weiner] at the time that he gave you the card?

A. Yes, a short one.

Q. All right. Will you tell us what he said to you and what you said to him.

A. He told me to sign the card, to sign the card, that he had the whole shop signed up, and he had a stack of cards in his hand and told me to sign the card. And I told him to wait, I wanted to talk to the old girls about it. He say he had all the old girls signed up, for me to sign it right now. I didn't know anything about the union, the card, nothing else. He never explained what it was for. So I signed the card to get rid of the man.

\* \* \* \* \* \*

Q. Mrs. Brown, did anybody connected with the union ever tell you what the card was for?

A. Well, like that, when I went to the meeting, he said the card, it wasn't anything to the card, it was the way you voted that was counted.

Q. Did no one connected with the union tell you that the card was only just to have an election?

A. I learned that when I went to the meeting.

Q. Who was it that told you it at the meeting?

A. I learned it from Mordecai.

\* \* \* \* \* \*

Q. But it was at a union meeting after you signed the card that you were told.

A. After I signed the card, that's when I learned all about, you know, what it mean.

\* \* \* \* \* \*

*Cross-Examination:*

Q. Before you signed the card did you talk to Mr. Weiner?

A. No, he didn't give me time.

\* \* \* \* \* \*

Q. He didn't tell you anything about the card?

A. He just told me to sign the card, he had the girls all signed up, the old girls.

6. Excerpts of testimony of Burdette:

Q. Mrs. Burdette, I am handing you a card which is in evidence in this proceeding as General Counsel's Exhibit 7s, and I ask that you examine it, please. Is the signature of Dema Burdette appearing thereon your signature?

\* \* \* \* \* \*

A. This right under here is my signature and the date and the year.

\* \* \* \* \* \*

A. Now, at the time that you were given the card did you have any conversation with either Mr. Weiner or with Norwood?

A. Yes, Mr. Weiner.

Q. Will you tell us as best you can remember what was said by them to you and by you to them if you said anything concerning this card?

A. Well, he didn't make no definite concern against that card. He was only telling me about the meeting and the union and telling me to come to the meeting. And the way he explained to me that if I would sign the card, he didn't tell me definite that I could come to the meeting, and I took it for granted, and just told me to sign. I didn't read it. I just signed the card.

\* \* \* \* \* \*

Q. Mrs. Burdette, did Mr. Weiner or Mr. Norwood tell you what the card was for?

A. No, he did not mention what the card was for.

Q. Did either of them say anything about what the card might be used for?

A. To my understanding was to attend the meeting.

\* \* \* \* \* \*

Q. Well, you think for a moment about the things that you told me at the time I interviewed you and asked you about what was said at the time the card was given to you for signature and see if you can remember anything else.

A. Here's what he told me. I can't say it word for word. He said "Come to the meeting and hear what we are doing." I said, "What would I hear?"

He said, "You come to the meeting and see what we are doing." Then after he made a lot of talk about the meeting, he said, "Will you sign the card?" I said, "What is it for?" He said, "To come to the meeting to see what we are doing." He said the card don't mean anything. Just come to the meeting. That's what he told me and I took it for granted I could go to the meeting if I signed the card.

\*　\*　\*　\*　\*　\*

Q. Did you read the card before you signed this?

A. No, I didn't. He didn't tell me to read it either.

Q. Did he read it to you?

A. No he didn't.

\*　\*　\*　\*　\*　\*

Q. Well, Mrs. Burdette, did anybody say anything about voting or how the card related to voting?

A. No he didn't mention that. He said the card didn't mean anything, he said it didn't mean anything and I gathered after he told me all of that it was just to attend the meeting. He didn't say nothing about no voting come into the factory, not about the card. He said "All it means is really to say yes about the union." He said, "That is only counted. The card don't mean that." He said, "The only thing is when they come in is say yes about the union."

Q. When they come in where?

A. He said, "When they come in voting." He said the card didn't mean anything.

*Cross-Examination:*

Q. Did you tell him when he was giving you the card "The union couldn't help me?"

A. I didn't read the card. I thought the card was just to attend the meeting.

Q. Yes or no, did he tell you that?

A. He didn't tell me. He just told me to sign.

Q. He didn't tell you the card was to attend meetings, that you understood?

A. He told me it didn't mean anything in the voting. He told me that.