**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**GENERAL STENCILS, INC., Respondent.**

**No. 184, Docket 72-1571.**

United States Court of Appeals, Second Circuit.

Argued Nov. 29, 1972.

Decided Dec. 22, 1972.

---

Stanley J. Brown, Atty., N. L. R. B. (Peter G. Nash, Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and John D. Burgoyne, Atty., N. L. R. B., of counsel), for petitioner.

Joel H. Golovensky, Mineola, N. Y. (Rains, Pogrebin & Scher, Mineola, N. Y., and Bertrand B. Pogrebin, Mineola, N. Y., of counsel), for respondent.

Before FRIENDLY, Chief Judge, and WATERMAN and HAYS, Circuit Judges.

FRIENDLY, Chief Judge:

In January, 1971, in NLRB v. General Stencils, Inc., 438 F.2d 894 (2 Cir. 1971), we remanded to the National Labor Relations Board the portion of its order of August 15, 1969, 178 N.L.R.B. 108, requiring a small Brooklyn manufacturer to bargain with a union which had obtained authorization cards from a majority of its production and maintenance workers in 1967. We did this in light of two factors: One was our holding that the Board's findings of unlawful interrogation of two workers were unwarranted under our decision in Bourne v. NLRB, 332 F.2d 47 (2 Cir. 1964); the other was a question whether the surviving findings met the requirements laid down in NLRB v. Gissel Packing Co., 395 U.S. 575, 613–615, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), for dispensing with a Board-supervised election and our inability to understand the seeming disparity between the Board's issuance of a bargaining order in this case and its failure to do so in others where the employer's conduct appeared to pose a graver threat to the conduct of an election. We presented the Board with three possible courses for applying its "*Gissel*-given authority" to issue a bargaining order on the basis of cards alone. These were, in descending order

of desirability: (1) use of the Board's rule-making power; (2) an illuminating opinion by the full Board; and (3) an explanation in each case "just what it [the Board or a panel] considers to have precluded a fair election and why, and in what respects the case differs from others where it has reached an opposite conclusion." 438 F.2d at 901–902.

More than fourteen months after our remand, on a further review of the record, two members of a three-man panel adhered to the initial determination. 195 N.L.R.B. No. 173 (1972). Chairman Miller dissented. In an opinion of the sort envisaged by the second possibility we had suggested, he analyzed a broad range of types of employer misconduct and sought to develop standards that would bring consistency and intelligibility into the Board's decisions.[1] The majority, however, opted for the third course.

The majority regarded as "the most salient violation" a threat of plant closure allegedly made by Joseph Klugman, the Company's general manager, to a single employee, Robert Kretschmer, who had already advised the employer of his intention to leave. It is worthwhile to state just what the evidence of this "threat" was. Kretschmer testified that after making unfavorable remarks about unions, Klugman "also said that he didn't have to give us, anything that— well, what I am going to say now was said before the union came in and during—", and then, after an objection by counsel,

Yes, this was all in the same conversation, but this was something that he had said before. I mean it is not something he just said at this one specific time, that he could always close, close the business.

Further, in response to the General Counsel's question on redirect "whether on more than one occasion Mr. Klugman said that if the union came in, he would close down or might close down," Kretschmer responded in the affirmative.

Kretschmer gave no testimony that he took this threat seriously or that he had ever communicated Klugman's remarks to any other employee in the two-month period before he left. Seventeen other employees were called by the General Counsel, but none testified to having heard such a threat, either directly or indirectly. The majority sought to avoid the absence of any such testimony by saying:

A threat of such serious consequences for *all* employees for selecting the Union will, all but inevitably, be discussed among employees.

Chairman Miller thought it made "no sense whatever to permit the only witness who heard a threat to testify that the threat was made but to remain silent on the question whether he disclosed the threat to any other employee," since "[a] chain of dissemination is a relatively easy matter to establish" but "nondissemination is virtually impossible to prove . . . ."[2]

---

1. Chairman Miller identified two types of misconduct which would justify a *per se* rule—the grant of significant benefits to thwart an organizing campaign, see United Packing Co., 187 N.L.R.B. No. 132 (1971), and the reassignment, demotion, or discharge of union adherents in violation of § 8(a)(3) of the NLRA. In contract to the treatment of such employer "actions," he proposed that where only employer "threats" were involved, the Board should analyze the nature of the threats, the likelihood that they would be seriously regarded by employees, and how widely they were dis-

seminated, and set forth considerations relevant to this analysis.

2. The Board argues that, under the rule prevailing when the case was tried, see 438 F.2d at 897, there was no reason for the General Counsel to elicit testimony with respect to dissemination. This is not altogether clear in light of the many Board holdings, criticized in NLRB v. River Togs, Inc., 382 F.2d 198, 206–208 (2 Cir. 1967), that the extent of an employer's § 8(a)(1) violations was relevant to a determination whether he had a good faith doubt of the union's ma-

. ██ While we agree that the General Counsel should not be relieved of this exceedingly slight burden before the Board can rely on such a threat to support a bargaining order, there are further circumstances invalidating the majority's conclusion in this case. As indicated, Kretschmer was about to leave; common sense dictates that the case for such an "inevitable" inference as the majority made is at its weakest when a "threat" to such an employee is involved. Indeed, Klugman's "threat" made so little impression on Kretschmer that at first he could not recall this part of their conversation. To bring Klugman's alleged remarks to Kretschmer under the same rubric as the repeated and detailed threats of plant closure which were the subject of the Court's rulings in Sinclair Co. v. NLRB, decided with *Gissel*, 395 U.S. at 618–619, 89 S.Ct. 1918, is an example of the "fallacy of the lonely fact" and the further fallacy of using the same word to cover wholly unlike situations. The Supreme Court detailed at great length the extent, reality, and immediacy of Sinclair's threats of plant closure. 395 U.S. at 587–589, 89 S.Ct. 1918. See also NLRB v. Sinclair Co., 397 F.2d 157, 159 (especially note 5), 160 (1 Cir. 1968). In contrast, Klugman's remarks, if made, went little beyond the truism that an employer can shut a plant at any time. American working men are bright and sturdy enough to know this, and also to know how unlikely it is that a small local employer will in fact close down a flourishing operation simply in a fit of pique. It is thus easy to understand why what has now become "the most salient violation" by respondent received no mention in the Board's original decision as a ground for a bargaining order.

The other ground advanced by the majority for finding § 8(a)(1) violations of such magnitude as to justify dispens-

ing with an election was this court's "inexplicable" failure to ascribe proper importance to "two specific violations of comparable gravity to the threat of closure; namely, the threat to lay off and the threat to discharge employees in the event the Union won an election." If we had done anything so truly inexplicable, we would have been in good company. Although the Board's previous decision noted these threats of layoff and discharge, 178 N.L.R.B. at 108 nn. 2 & 3, it supported its bargaining order by referring only to the employer's "intention to revoke many existing privileges if they [the employees] elected the Union." In its brief in this court the Board argued that the bargaining order was justified in light of the employer's threatening the employees "with loss of benefits, disciplinary sanctions and the possibility of plant closure;" it said nothing of threats of layoff or discharge. Following these leads, after discussing the plant closure issue, we referred to "threats to a few employees to withdraw benefits of a relatively minor nature." 438 F.2d at 902–903.

██ We find the Board's newly found reliance on the "threats" to lay off and discharge as a ground for a bargaining order to be unwarranted. The bases for the claimed "threat to discharge employees in the event the Union won an election," were the following testimony of Kenneth De Thomas:

Q. What did Mr. Klugman say to you?

A. He was talking about people being late, and he said that he would have to enforce a new rule, if anyone was late three times in a month, that they would be fired, and he also stated that if the union got it—

Q. I'm sorry. Would you repeat that?

---

jority. But assuming that point in the Board's favor, a legitimate excuse for not adducing evidence is not the equivalent of its existence; it was open to General Counsel to ask to have the record

reopened, as we had suggested the Board do "in light of the fact that the case was tried on the basis of a legal standard different from that now applied." 438 F.2d at 905.

A.  He stated if the union got in, he would have to enforce a new rule on lateness, that anyone late three times in a month would be fired.

and testimony by Marie Lamattina referring to a statement by Klugman, "And if we came in late, he could fire us for it." [3] This is a rather long way from the dramatic characterization the majority opinion of the Board has now given to it. The Union would have something to say about the existence and administration of any such rule. Moreover, any employee could avoid "discharge" by the simple method of coming to work on time. The evidence of the "threat" of layoffs was a sentence in Miss Lamattina's testimony just preceding that last mentioned, "And he said that well, if the union came in, and it got slow, he could lay us off." [4] There was nothing to suggest any likelihood that work was going to get "slow" within any foreseeable time; Klugman testified without contradiction that the company was extremely busy. While there was testimony that in the past the company had generally found something for employees to do, as was in its interest, in cases of temporary slackening, no employee could have supposed that, union or no union, the company would indefinitely keep on its payroll workers for whom it had neither actual nor prospective use.

■ The lack of support for the majority's conclusion that Klugman's conduct impaired the prospect for a fair election is confirmed by a reading of the record as a whole. Of the eighteen employees called by the General Counsel, only one, Miss Lamattina, testified that Klugman's clumsy sallies had caused her any fear. The same witness admitted that much of the employees' speculation about possible crackdowns on lateness and other matters came before Klugman

had said anything. The picture emerging from the entire record is of employees who remained in a perfectly good position to weigh, in Miss Lamattina's words, both the good and the bad things which they knew, apart from any statements by Klugman, would happen if the union came in.

The Board's attempted explanation of its failure to issue a bargaining order in the three post-*Gissel* cases cited in our previous opinion, 438 F.2d at 903–904, as seemingly presenting more serious violations than in the instant case, is equally unconvincing. The majority appeared to think it sufficient to say that the cases were different, as all cases are, whereas the real question is whether they were significantly different, and, if so, how. As an example of the opinion's analysis, it will suffice to cite Blade-Tribune Publishing Co., 161 N.L.R.B. 1512 (1966), remanded in light of NLRB v. Gissel Packing Co., 71 L.R.R.M. 3104 (9 Cir.), bargaining order withdrawn, 180 N.L.R.B. 432 (1969), where the employer systematically interrogated the majority of the employees with regard to their union sympathies, implicitly promised new benefits to induce the employees to reject the union, and, as the Board majority here characterized it, made "a change in the work schedule of one union adherent." Incredibly, the majority, or whoever wrote their opinion, chose to omit any reference to the circumstances which made this last conduct a most serious violation. As the Board found in *Blade-Tribune*, 161 N.L.R.B. at 1528, the employer had deliberately and discriminatorily imposed an extraordinarily harsh work schedule on an active union adherent in an attempt to force him to quit—the sort of conduct that Chairman Miller believed would justify a per se rule that the employer be ordered to bargain. Although the Board majority here

---

3. She later amplified this, "He said if we came in late a few times, he could fire us for it."

4. The two were linked by another "threat": "You know, and he said, that he could stop the radio playing and not let us play it, you know." The witness acknowledged that the word was "could," not "would."

lamely asserts that there were no "direct threats to layoff or discharge employees for selecting the Union," the Board in *Blade-Tribune* found that the employer's action was intended "to serve notice on all the other employees that adherence to the Union would result in reprisal." 161 N.L.R.B. at 1528. To say that this blatant misconduct of the employer in *Blade-Tribune*, along with his other unlawful acts, is less serious than Klugman's anti-union remarks here goes beyond the bounds of rationality.

■ We are aware of the statement in a footnote to the *Gissel* opinion, 395 U.S. at 612 n. 32, 89 S.Ct. at 1939 that "In fashioning its remedies under the broad provisions of § 10(c) of the Act (29 U.S.C. § 160(c)), the Board draws on a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given special respect by reviewing courts." Whether the duty of deferral is weakened when the experts disagree would be an interesting subject for legal commentators. *Cf.* Northeast Airlines, Inc. v. CAB, 331 F.2d 579, 589 (1 Cir. 1964) (Aldrich, J., concurring). We need not undertake such an exploration here. We fault the majority not because of disagreement with the few general views on labor policy that it expressed, but because of its blowing up bits and pieces to arrive at a conclusion not justified by a fair reading of the record as a whole. It was to prevent administrative action of just this sort that § 10(e) of the Administrative Procedure Act, 5 U.S.C. § 706, directed the courts to review the whole record and to set aside arbitrary or capricious agency actions, and the Taft-Hartley Act made the Labor Board's findings of fact conclusive only "if supported by substantial evidence on the record considered as a whole," 29 U.S.C. § 160(e), (f). As the Court said in Universal Camera Corp. v. NLRB, 340 U.S. 474, 490, 71 S.Ct. 456, 466, 95 L.Ed. 456 (1951), Congress has imposed on the courts of appeals "responsibility for assuring that the Board keeps within reasonable grounds." We hold it exceeded them here.[5]

Enforcement is denied.

---

5. We had suggested that, although perhaps not required to do so under NLRB v. Katz, 369 U.S. 736, 748 n. 16, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962), the Board might find this an appropriate case for considering employee turnover, as proposed in NLRB v. American Cable Systems, Inc., 427 F.2d 446, 448–449 (5 Cir.) cert. denied, 400 U.S. 957, 91 S.Ct. 356, 27 L.Ed.2d 266 (1970), and in Judge McCree's dissent in G. P. D., Inc. v. NLRB, 430 F.2d 963, 965–966 (6 Cir. 1970), cert. denied, 401 U.S. 974, 91 S.Ct. 1193, 28 L.Ed.2d 323 (1971). The majority dismissed this in a footnote saying "we deem it inappropriate to consider employee turnover since the original entry of the bargaining order" because an employer should not be rewarded for his misconduct, citing NLRB v. L. B. Foster Co., 418 F.2d 1 (9 Cir. 1969), and NLRB v. Kostel Corp., 440 F.2d 347 (7 Cir. 1971). While we need not place our refusal to enforce on this ground, the majority's statement strikes us as rather casual. Respondent claims there was a 43% turnover before the hearing, and a 70% turnover before the Board's deliberately postponed decision, see 438 F.2d at 896, to issue a bargaining order. Then came a further delay of over a year before the Board filed its brief seeking enforcement, *id.* After our remand the Board took more than fourteen months to render its opinions. As a result, we are now five and a half years away from the time when the union walked away from an election. It is true that the Court indicated in *Katz* that lapse of time alone is not a sufficient reason to deny enforcement of a bargaining order, and noted in *Gissel*, 395 U.S. at 610–611, 89 S.Ct. 1918, that the Board need not establish that the union has maintained its majority despite the passage of time before issuance of a bargaining order if the order is otherwise appropriate. But this does not mean that the passage of time or proof of employee turnover is irrelevant for all purposes. When the employer's unlawful practices fall outside the "outrageous" or "pervasive" category, the Court in *Gissel* held that "effectuating ascertainable employee free choice becomes as important a goal as deterring employer misbehavior," 395 U.S. at 614, 89 S.Ct. at 1940. See Christensen & Christensen, *Gissel Packing* and "Good Faith Doubt": The Gestalt of Required Recognition of Unions under the NLRA,

HAYS, Circuit Judge (dissenting):

In N. L. R. B. v. Gissel Packing Co., 395 U.S. 575, 612 n. 32, 89 S.Ct. 1918, 1939, 23 L.Ed.2d 547 (1969) the Court said:

> "The employers argue that the Fourth Circuit correctly observed that, 'in the great majority of cases, a cease and desist order with the posting of appropriate notices will eliminate any undue influences upon employees voting in the security of anonymity.' NLRB v. S. S. Logan Packing Co., [4 Cir.,] 386 F.2d [562,] at 570. It is for the Board and not the courts, however, to make that determination, based on its expert estimate as to the effects on the election process of unfair labor practices of varying intensity. In fashioning its remedies under the broad provisions of § 10(c) of the Act (29 U.S.C. § 160(c)), the Board draws on a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given special respect by reviewing courts. See Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203 [, 85 S.Ct. 398, 13 L.Ed.2d 233] (1964). '[I]t is usually better to minimize the opportunity for reviewing courts to substitute their discretion for that of the agency.' Consolo v. FMC, 383 U.S. 607, 621, [, 86 S.Ct. 1018, 1027, 16 L.Ed.2d 131] (1966)."

This court has said that the Board is invested with "almost total discretion" in determining when a bargaining order is the appropriate remedy for violations of the Act. N. L. R. B. v. International Metal Specialties, Inc., 433 F.2d 870, 872 (2d Cir. 1970), cert. denied, 402 U.S. 907, 91 S.Ct. 1378, 28 L.Ed.2d 647 (1972).

In warning the Courts of Appeals that it is for the Board not the courts to determine whether a bargaining order is justified, the Supreme Court could hardly have been more emphatic than it was in Gissel. Yet circuit judges continue to be so profoundly convinced of their own expertise in such matters that they do not hesitate to disregard the Supreme Court's admonitions. Surely such matters as the effect on employees of threats to close the plant, to discharge for tardiness and to deprive them of plant privileges, are exactly the areas in which the Board rather than the judges have a special "fund of knowledge and expertise." If ordinary common sense would not provide the answer, surely the Board would know better than the judges whether the report of an employer's threat of plant closure is likely to spread among the employees of a tiny plant all working in close proximity to one another.

While it may have been proper for the court, having found that the employer's interrogation of employees did not violate the Act, to remand the case to the Board to determine whether the remaining unfair labor practices were sufficient to justify a bargaining order, the court should now accept the Board's decision on that point. I, therefore, dissent.

37 U.Chi.L.Rev. 411, 422 (1970). Moreover, to determine the appropriateness of a bargaining order, the *Gissel* Court mandated an inquiry into the effect of the employer's unfair labor practices on the election process and the likelihood that these practices or their recurrence in the future will prevent a fair election. Where the focus is thus on ascertaining employee choice and examining the conditions likely to surround a future election, changes in personnel and the passage of time are relevant considerations in the Board's analysis. When the question whether the employer's conduct prevented a fair election is marginal in any view, as demonstrated by a dissent from one of its own members, it would seem that the Board should more carefully weigh the deterrent effect of a bargaining order on an employer found to have violated § 8(a)(1) *against the possibility of inflicting what may be a totally unwanted, and even largely unknown, union on a new work force*. See NLRB v. Staub Cleaners, Inc., 418 F.2d 1086, 1090 (2 Cir. 1969) (Lumbard, Chief Judge, dissenting).