**WALGREEN CO., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 73–1934.**

United States Court of Appeals, Seventh Circuit.

Argued Oct. 1, 1974.

Decided Jan. 21, 1975.

Craig L. Ames, Chicago, Ill., for petitioner.

Peter G. Nash, Gen. Counsel, Allison W. Brown, Atty., N.L.R.B., Washington, D. C., for respondent.

Before PELL, SPRECHER and LAY,* Circuit Judges.

LAY, Circuit Judge.

Walgreen Company has filed a petition to review, and the National Labor Relations Board a cross-application to enforce, a Board order issued against the

Company on September 24, 1973. The Board's decision and order are reported at 206 NLRB 15. The Board found numerous § 8(a)(1) violations as well as a wrongful discharge in violation of §§ 8(a)(3) and (1), and it issued a bargaining order. We grant enforcement of the Board's order.

In 1970 Walgreen opened a new drug store in Petaluma, California. Shortly thereafter the Retail Clerks Union Local 1532 tried to organize the store's employees, but lost a Board election in January 1971. In 1972 a second organizational attempt was made. The Union petitioned for a Board election on April 14, 1972. The election was set for June 14, 1972. On June 9, the Union wrote to the Company stating that it had a card majority of the employees and requested immediate recognition. This was refused by the Company. The Company does not contest, and the record shows, that prior to the election the Union held a valid card majority. The Union subsequently lost the election. Of the 21 votes cast, nine were for the Union, nine were against and three votes were successfully challenged.

I. *The Unfair Labor Practices*

The Administrative Law Judge found that the Company had violated § 8(a)(1) of the National Labor Relations Act by (1) interrogating employees about Union activities, (2) promising wage increases, (3) threatening to close the store if the Union won the election, (4) threatening denial of promotions to Union adherents, (5) threatening that the Company would refuse to sign ·a collective bargaining agreement, (6) creating an impression of surveillance of Union activities, and (7) imposing onerous work schedules to punish Union adherents. In addition, he found that the Company violated §§ 8(a)(1) and 8(a)(3) by its discriminatory discharge of clerk Debra O'Neil soon after the election.

The Board adopted the Administrative Law Judge's findings, and in addition upheld a § 8(a)(1) charge, rejected by the

---

* Judge Donald P. Lay of the Eighth Circuit is sitting by designation.

Administrative Law Judge, regarding remarks made to Warren Whitney, the husband of an employee.

The unfair labor practices found by the Administrative Law Judge and the Board may be briefly summarized.

(1) *Interrogating employees about Union activities*

■ Store Manager James Thornton received the Union's election petition on April 15. That day, he called checkout clerk Debra O'Neil into his office and asked her, in the presence of bookkeeper Audrey Milligan, when she had seen the Union representatives and why she wanted the Union. On subsequent occasions, Thornton interrogated four other employees as well as Warren Whitney, the husband of employee Judith Whitney.

(2) *Promising wage and benefit increases*

■ Also on April 15, Thornton told Debra O'Neil that all employees would be getting a raise. Audrey Milligan and Darlene Barlow heard the same promise that day, as did employee Jim Stone, whose mother, Anna Jo Davidson, was also an employee. Thornton told Warren Whitney that the Company was working on "sick leave, improved hospitalization, and improved profit sharing, but [the Company] could not put such benefits into effect while the Union was in the picture."

(3) *Threatening to close the store if the Union won the election*

■ When he promised Darlene Barlow her raise, Thornton told her that if employees voted the Union in, the store might close. In late April he told Darlene Barlow and Ron Morgan that the store would close if the Union won. Finally, Thornton told Warren Whitney that Richard Wessels, the Company's Director of Employee Relations, had said that the store would have been closed had the Union succeeded in its prior campaign, and that the Company was "not about to let a store like that go Union."

Shortly before the election, Assistant Store Manager Philip Johnson told Jim Stone that it would be cheaper for the Company to close the store rather than to sign a Union contract, since the store was operating at a loss. Later, Johnson used a pencil and paper to illustrate this argument to bookkeeper Audrey Milligan.

(4) *Threatening denial of promotions to Union adherents*

■ Thornton told Ron Morgan that support for the Union would mean loss of any chance to become an Assistant Manager and to participate in the training program. Thornton told bookkeeper Audrey Milligan that the Company would not promote her to auditor if the Union won. The Administrative Law Judge found these statements to be "good sound advice, tendered in the friendliest of spirit, but [they] did violate Section 8(a)(1) of the Act."

(5) *Threatening that the Company would refuse to sign a collective bargaining agreement*

■ At various times before the election. Thornton told four employees and Warren Whitney that the Company would refuse to sign a contract, indicating that a strike would be necessary.

(6) *Engaging in surveillance and creating an impression of surveillance of Union activities*

■ Thornton believed until shortly before the election, mistakenly, that Judith Whitney strongly opposed the Union. He tried to enlist her husband to spy on the employees for him. Shortly before the election, Thornton told Audrey Milligan that he knew who had signed Union cards and insisted that she list those whom she believed had done so. After the election, Assistant Manager Johnson told the employees that the Company knew how everyone had voted.

(7) *Imposing onerous work schedules to punish Union adherents*

■ The Administrative Law Judge found that just prior to the election, Thornton knew that Debra O'Neil, Rob-

ert Levin, Audrey Milligan and Judith Whitney supported the Union. Immediately after the election, Thornton posted work schedule changes. Audrey Milligan, who had been bookkeeper ever since the store opened, was demoted to cigar counter cashier on the night shift. Pharmacist Levin was switched from a daytime weekday schedule to the night shift and was told that he would have to work weekends. Judith Whitney was switched from the day shift to the night shift, and Ginger Johnson was moved from nights to days, despite the fact that both employees preferred the prior arrangement and no legitimate reason for the switch was advanced by the Company.

### (8) *The discharge of Debra O'Neil*

█ Debra O'Neil, an open Union adherent, was fired by Thornton on August 4, 1972, allegedly for tardiness and rudeness to customers. Thornton testified that he discharged her because of a customer's complaint that she had called him an S.O.B. The customer, Colonel Hoteling, denied that she had so addressed him, as did O'Neil.

The Administrative Law Judge credited the Colonel's testimony that O'Neil had brusquely told the Colonel's wife, when asked whether a certain item was in stock, "If it's not there, it's not there." The Colonel's complaint about that incident to Thornton was found to have been a pretext for a discharge actually motivated by a desire to discour-

age Union membership in violation of §§ 8(a)(1) and 8(a)(3).

We find substantial evidence on the record to sustain the Board's findings.

### II. *The Bargaining Order*

█ The more difficult issue relates to the Board's bargaining order issued pursuant to NLRB v. Gissel Packing Co., Inc., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969).[1] In previous decisions the courts of appeals have directed the Board to make a detailed analysis and findings as to the three criteria necessary to support a Board order under *Gissel.*[2] *See, e.g.,* Peerless of America, Inc. v. NLRB, 484 F.2d 1108, 1118 (7th Cir. 1973); NLRB v. Copps Corp., 458 F.2d 1227, 1229–1230 (7th Cir. 1972); NLRB v. General Stencils, Inc., 438 F.2d 894, 901–902 (2d Cir. 1971). The judicial response to the Board's continued failure has been divided. In some instances, cases have been remanded to the Board for further findings, *see, e.g.,* New Alaska Development Corp. v. NLRB, 441 F.2d 491, 494–495 (7th Cir. 1971); NLRB v. General Stencils, Inc., *supra,* 438 F.2d at 901–902, 905; Clark's Gamble Corp. v. NLRB, 407 F.2d 199, 202 (6th Cir. 1969); *see also* note 5 *infra.* Where Board findings are inadequate, however, in many instances the court has undertaken its own analysis of the record to determine whether the bargaining order should be enforced. *See, e.g.,* NLRB v. Gruber's Super Market, Inc., 501 F.2d 697 (7th Cir. 1974); Peerless of America, Inc. v.

---

1. The Company additionally complains that the bargaining order should not issue since the complaint did not contain a § 8(a)(5) charge. This circuit along with other courts of appeals has uniformly held that even absent a § 8(a)(5) violation, the Board's authority to issue a bargaining order in favor of a Union which had majority support when it made its demand "is settled." NLRB v. Drives, Inc., 440 F.2d 354, 366 (7th Cir.), cert. denied, 404 U.S. 912, 92 S.Ct. 229, 30 L.Ed.2d 185 (1971); *accord,* NLRB v. Dan Howard Mfg. Co., 390 F.2d 304, 309 (7th Cir. 1968); Wausau Steel Corp. v. NLRB, 377 F.2d 369, 373 (7th Cir. 1967); United Steelworkers v. NLRB, 126 U.S.App.D.C. 215, 376 F.2d 770, 772–773, cert. denied sub nom. Northwest Eng'r Co. v. NLRB, 389 U.S. 932, 88 S.Ct.

297, 19 L.Ed.2d 285 (1967); Steel-Fab, Inc., 212 NLRB 25, 86 LRRM 1474 (1974).

2. These oft-repeated tests need no further amplification. They are:
   (1) Did the Union have majority support in an appropriate unit prior to the impact of Company unfair practices?
   (2) Did Company unfair practices cause the Union to lose its majority?
   (3) Will lesser remedies be insufficient to overcome the impact of past unfair practices or to deter similar future conduct, so that a fair election could not be held within a reasonable time?
   *See* NLRB v. Gissel Packing Co., Inc., 395 U.S. 575, 614, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969).

NLRB, *supra*, 484 F.2d at 1120; NLRB v. Kostel Corp., 440 F.2d 347, 352 (7th Cir. 1971).

The Board has not provided us with the requisite analysis in the instant case. However, notwithstanding the Board's conclusory findings, where the unfair practices in the factual record are as pervasive as here, this court must give due recognition to the *Gissel* direction that

> [i]t is for the Board and not the courts, however, to make that determination, based on its expert estimate as to the effects on the election process of unfair labor practices of varying intensity. In fashioning its remedies under the broad provisions of § 10(c) of the Act (29 U.S.C. 160(c)), the Board draws on a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given spe-

cial respect by reviewing courts. See Fibreboard Paper Products v. NLRB, 379 U.S. 203 [, 85 S.Ct. 398, 13 L.Ed.2d 233] (1964). "[I]t is usually better to minimize the opportunity for reviewing courts to substitute their discretion for that of the agency." Consolo v. FMC, 383 U.S. 607, 612 [, 86 S.Ct. 1018, 1027, 16 L.Ed.2d 131] (1966). 395 U.S. at 612 n.32, 89 S.Ct. at 1939.[3]

Our enforcement on the present record is not intended to detract from the *Peerless* guidelines.[4] This circuit's requirement that the Board provide analysis and findings serves as a prophylaxsis against an arbitrary exercise of the Board's power. When the Board has not done this, this court must balance the need for such findings on the overall record presented as against the inefficient process resulting from remand to the administrative agency.[5] When the

---

**3.** In Peerless of America, Inc. v. NLRB, 484 F.2d 1108 (7th Cir. 1973), this court described the analysis necessary to support a bargaining order:

> We recognize that the determination of the immediate and residual impact of unfair labor practices may be a diffuclt task. . . . But by "specific findings" in this regard we hardly mean that the Board must determine how many employees actually were caused to abandon the Union. We mean only that it estimate the impact, taking into account the factors in the particular case which are indicative of actual effect or which plausibly, in the light of existing knowledge, would contribute to or detract from an actual impact. This is, after all, what the courts which have made their own analyses have done. Similarly the "detailed analysis" of the likelihood of recurring misconduct and of the potential curative effect of ordinary remedies only requires an appraisal of those factors which might reasonably have a bearing, such as whether the employer has a history of anti-union animus and Labor Act violations, whether the employer has taken affirmative rectifying measures or otherwise indicated his cooperativeness in assuring a fair election, etc.

*Id.* at 1118 n.16.

**4.** Although the Board's expertise in the *Gissel* area has been attacked (*cf.* Getman & Goldberg, The Myth of Labor Board Expertise, 39 U.Chi.L.Rev. 681, 683–84 (1972)), it must be

recognized that it is Congress, the policy-making body of our government, which established the Board, 29 U.S.C. § 151 et seq., and the Supreme Court in *Gissel* which has given its imprimatur to the Board's expertise. In *Gissel,* the Court recognized in one of the cases (*General Steel*) that although the Board had not made specific findings to justify a *Gissel* order, they might nonetheless be implicit in the Board's order. 395 U.S. at 616, 89 S.Ct. 1918.

**5.** The years consumed on remand have seldom been compensated for by more detailed analysis of the need for a bargaining order by the Board, which was the reason for remand in the first place. For example, in December 1972, the Second Circuit finally denied enforcement to a bargaining order based on unfair practices during the summer of 1967, five years earlier. The Board's original order in the case was not issued until August 1969, General Stencils, Inc., 178 NLRB 18, 71 LRRM 1652 (1969), and enforcement was not sought until late in 1970. In January 1971, the Second Circuit remanded the case with directions to amplify the need for a bargaining order. NLRB v. General Stencils, Inc., 438 F.2d 894 (2d Cir. 1971). The Board's supplementary opinion issued in March 1972, 195 NLRB 173, 79 LRRM 1608 (1972), was again found insufficient by the Second Circuit, but rather than a second remand, the court denied enforcement. 472 F.2d 170 (2d Cir. 1972).

Even worse has been the *General Steel* litigation from the Fourth Circuit, which has

facts clearly show only isolated violations of § 8(a)(1), so that under any analysis a court would feel compelled to set aside a bargaining order, a remand would simply increase the administrative and judicial burden of all concerned. *Cf.* NLRB v. Gruber's Super Market, Inc., *supra*; Peerless of America, Inc. v. NLRB, *supra*; Arbie Mineral Feed Co. v. NLRB, 438 F.2d 940 (8th Cir. 1971); Fremont Newspapers, Inc. v. NLRB, 436 F.2d 665 (8th Cir. 1970).

consumed *ten years* between the commission of unfair labor practices in 1964 and the court's enforcement of the Board's bargaining order in October 1974. In the interim, the Board had originally ordered bargaining, General Steel Products, Inc., 157 NLRB 59, 61 LRRM 1417 (1966), and the Fourth Circuit denied enforcement, 398 F.2d 339 (4th Cir. 1968). The Supreme Court granted certiorari and reversed this case and three others in *Gissel*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). On remand, the Board again ordered bargaining in conclusory language. 180 NLRB 8, 72 LRRM 1579 (1969). The Fourth Circuit again refused to enforce the bargaining order, citing the Board's lack of detailed analysis. 445 F.2d 1350 (4th Cir. 1971). On the second remand, the Board ordered an election rather than bargaining, 199 NLRB 121, 81 LRRM 1513 (1972). In December 1973, the Company objected to the second election won by the Union. The Board overruled these objections and entered another bargaining order, 207 NLRB 112, 85 LRRM 1003 (1973). This order was recently enforced. General Steel Products v. N.L.R.B. 503 F.2d 896 (4th Cir. 1974).

6. The Company claims that the Board erred in ordering bargaining despite the fact that Manager Thornton was transferred to another state soon after his discriminatory discharge of Debra O'Neil. We disagree. Even assuming that changes in management, occurring after pervasive unfair labor practices have successfully undermined a union's card majority, might sometimes militate against a bargaining order, *cf.* NLRB v. Gruber's Super Market, Inc., *supra*, and Peerless of America, Inc. v. NLRB, *supra*, we are not persuaded that the Board erred here. Thornton was transferred, not discharged, and there is no indication that employees saw the transfer as a punishment rather than as a promotion. Further, Assistant Manager Philip Johnson, who also took an active part in the Company's unfair labor practices, was not discharged or otherwise disciplined.

7. In order to avoid any misunderstanding, and contrary to the implications of Judge Pell's

Equally, where the unfair labor practices are pervasive, the court must consider the Board's recognized expertise in weighing the lack of feasibility in a remand. We find the latter situation to be the case here.[6] *Cf.* NLRB v. Copps Corp., *supra*; NLRB v. Henry Colder Co., 447 F.2d 629, 630 (7th Cir. 1971); NLRB v. Drives, Inc., 440 F.2d 354 (7th Cir. 1971); NLRB v. Kostel Corp., *supra*.

The Board's order is enforced.[7]

dissent, we have carefully weighed the ALJ's unfortunate rhetoric. Notwithstanding his confusing reference to Sir Conan Doyle's literary quest for truth ("There remains however, grossly improbable, uncontradicted testimony, which on the admonition of Sherlock Holmes, must be the truth."), the ALJ did carefully weigh the evidence and make proper findings of fact. He noted: "No witness was conscious of any deliberate prevarication. No witness had any clear uncontaminated recollection of the original event described in his or her testimony." The ALJ then made sixteen specific findings of fact, carefully analyzing the testimony of each witness, crediting some and discrediting others. For example, in discussing the illegal promise of wage increases he found:

Neither can I credit the testimony of Brandner, Davidson, Ginger Johnson or Barlow as to the amounts promised. These are all intelligent literate persons, who must be charged with knowledge that both wages and prices were limited by Executive Order under the Wage Stabilization Act. I nevertheless, base the above finding on Thornton's admission that he did tell some employees, including O'Neil, that he was recommending raises, on the fact that there is no corroboration of Thornton's testimony as to the date of his telephone call to Saunders, no credible corroboration of Thornton's testimony that any of these promises were made before April 15, and the fact that there is no reason on this record, other than receipt of the Union's petition, for telling employees in April, 1972, that they would receive raises. These promises of wage increases restrained and coerced employees in the exercise of Section 7 rights.

We think the substance of the overall findings of fact to be more significant than the literary idiosyncrasies of the hearing judge. Additionally, we give weight to the Board's analysis of the ALJ's findings. The Board stated in footnote 1 of its opinion:

The Respondent and the General Counsel have excepted to certain credibility findings made by the Administrative Law Judge. It is the Board's established policy not to

PELL, Circuit Judge (dissenting).

In the absence of a congressional mandate that this court should enter an enforcement judgment of administrative agency orders solely upon the request of the agency, I find myself considerably disturbed by the majority opinion in this case, the net effect of which is that since the agency has declined once again to follow the explicit and repeated direction of this court "to make a detailed analysis and findings," we should therefore just drop the whole matter and order enforcement. I am particularly disturbed where what is involved is the extraordinary procedure of ordering an employer to bargain with a union which failed to demonstrate in a Board conducted secret election that it represented a majority of the employees. Accordingly, I respectfully dissent from that portion of the opinion which orders enforcement of the so-called *Gissel* order.

While I am confining my dissent to the *Gissel* aspect of the case, I think it is appropriate, as a threshold matter, to observe that the balance of the Board's order is founded on an evidentiary basis which can only charitably be described as other than feeble. It is not necessary to look further than the Administrative Law Judge's (ALJ) decision:

"As the hearing developed, I received the distinct impression that all witnesses, with the exception of Wessels, Johnson, Rogan and Hoteling had been programmed before taking the stand, and were simply responding to cues provided by their direct interrogators."

Wessels, a lawyer, was at all pertinent times director of Employee Relations for Walgreen at its Chicago headquarters office. Johnson was assistant manager at the Petaluma store. Rogan at the time

overrule an Administrative Law Judge's resolutions with respect to credibility unless the clear preponderance of all of the relevant evidence convinces us that the resolutions are incorrect. Standard Dry Wall Products, Inc., 91 NLRB 544, enfd. 188 F.2d 362 (C.A. 3). We have carefully examined the record and find no basis for reversing his findings.

206 NLRB No. 15.

of the hearing before the ALJ, in December 1972, was assistant manager of the Petaluma store, having succeeded Johnson. He had been an employee at the time of the election and was examined briefly about the authorization card he had signed. His testimony (he had been called by the company) related mostly to the discharge of O'Neil. Hoteling, as indicated in the majority opinion, was not an employee but was a customer who had been involved in the O'Neil discharge incident which occurred in August 1972 about two weeks before Johnson left employment with Walgreen, all of which was approximately two months after the election, just prior to which the union held signed authorization cards from eleven of the twenty employees. Other than Wessels and Johnson, none of the witnesses named by the ALJ, whom he found to be the only witnesses testifying independently of cueing, and whose credibility it would seem he found superior, testified as to any of the unfair labor practices claimed to have vitiated the union majority at the time of the election. I find no support for the vitiation in the testimony of Wessels and Johnson.

Again, from the ALJ's decision:

"Thornton [whose name was ordinarily spelled Thorton in the hearing transcript] did not remember what he had said to individual employees. Neither did witnesses called by the General Counsel have any clear recollection of the original events . . . Each witness, on the stand, attempted with varying success to conform his or her testimony, to the final version incorporated in the pre-trial affidavit . . Much of [Judith Whitney's] testimony was elicited through grossly leading and suggestive questions . . .

The test we apply is, of course, whether the Board's order is supported by substantial evidence on the record as a whole. We think a fair reading of the record clearly establishes this.

The dissent describes the evidence supporting the unfair labor practices as "feeble." We find it "pervasive." Herein lies our essential disagreement over the appropriateness of the Board's bargaining order.

The only testimony which I regard as generally reliable is that of Wessels, Hoteling, Johnson and Rogan. Where the recollections of Johnson and Rogan differ, I have credited Rogan. Johnson is completely free of bias."

Apropos of the last observation of the ALJ, it is of interest that the majority opinion states that Johnson took an active part in the Company's unfair labor practices.

Further from the ALJ's decision:

"Wessels [about May 11] then returned to Chicago where he prepared the literature to be used in the campaign. He delivered these papers in person to the District Manager in San Francisco on May 25, with specific instructions as to the date and method of distribution of each of seven communications. Some were to be mailed, others distributed by hand and others posted. On May 26 he saw Thornton at the store and gave him the literature which he was to distribute. *Wessels' instructions were followed to the letter.* No statement in any of his propaganda is demonstrably untrue, and none exceeds the limits of Section 8(c) of the Act.

"The final act in Wessels' campaign was a gathering at a fine restaurant after closing hours on June 13, election eve. Attendance was voluntary. Eligible voters, wives, husbands and their guests were welcome. Sandwiches, coffee and soft drinks were provided. Short talks were given by Respondent's vice president, Canning, by its Division manager from Denver, by the two district managers, and by Wessels and Thornton. *None exceeded the permissive limits of Section 8(c) of the Act.*" (Emphasis added.)

Then applying a principle of credibility determination which apparently has no other source than the facile pen of Conan Doyle, the ALJ concluded that certain findings were indicated even though they were improbable:

"In The Sign of Four, Chapter VI, Sherlock Holmes admonishes Doctor Watson, 'How often have I said to you that when you have eliminated the impossible, whatever remains, *however improbable*, must be the truth.'" (Emphasis in original.)

After supporting his premise of improbability by an analysis of the witnesses' testimony, the ALJ forged ahead to his Holmesian conclusion:

"There remains however, grossly improbable, uncontradicted testimony, which on the admonition of Sherlock Holmes, must be the truth."

There remains a substantial question in my mind as to whether grossly improbable evidence, as it is characterized by the finder of fact, can be substantial evidence in an enforcement proceedings, particularly where the grossly improbable testimony was the only evidence of all of the pre-election claimed unfair labor practices. Assuming *arguendo*, however, that the record permits all of the order except the *Gissel* portion to sneak by on the basis of the limited scope of our review, I address myself to the order to bargain which I sincerely believe we cannot tolerate on this record. In this respect, I do not think we can ignore the ambivalency of the record as it was analyzed by the ALJ.

Thus as an initial matter on this phase of the case I note the ALJ's finding that "Wessels could not believe that Thornton, with his loyalty, intelligence, experience and training would have overstepped legal limits." In New Alaska Development Corp., 194 NLRB 830 (1972), the Board dismissed the 8(a)(5) allegations of the complaint (which significantly were not even filed in the complaint before us). The Board action followed a refusal by this court to enforce an order to bargain because the Board had not, "in accordance with the requirements of the *Gissel* case, made a proper analysis of the causal connection between the unfair labor practices and the undermining of the election process which would demonstrate that the holding of a free and fair election had been precluded."

On that analysis being made, the Board concluded that there was insufficient likelihood that illegal conduct would recur. While *New Alaska* is not on all-fours with the present case, there is substantial identity on significant points. In *New Alaska*, there had been two elections as here with some of the unfair labor practice conduct having occurred in the first election. I am unable to find any indication in the present record that there was any such claim as to the first Petaluma election conducted in January 1971. This has a secondary significance because Thornton was transferred as manager to Petaluma in November 1971 *after* the first election. It is also to be noted that, as it was found by the ALJ, Wessels could properly believe that Thornton would not overstep legal limits in the campaign, as Thornton had previously been manager in three different Walgreen stores operating under union contracts.

It is true in *New Alaska* that the erring employee was characterized as a minor supervisor whereas Thornton was the store manager. It is a matter of fairly common knowledge that the manager of a store which is a part of a large national chain is given very little high level discretion and operates under precise rules in carrying out his well-defined duties, however, it is not necessary to rely upon this knowledge in the present case. The record affirmatively shows that the company shots in labor union election campaigns were to be called by Wessels, the national director of labor relations for this 600 store chain. He did so and assumed because of Thornton's background the directions would be followed. Indeed, the ambivalence of the record is reflected in the ALJ's finding that "Wessels instructions were followed to the letter." The booklet which Wessels reviewed for four hours with Thornton was a "do and don't" book and again in the words of the ALJ "is an excellent summary in less than 1500 words of the rights and limitations of management in a union organizing campaign." Wessels obviously recognized that Thornton was going to be the chief day-to-day Walgreen representative at the store but apparently mistakenly thought he would not exceed the guidelines of proper procedure.

As I read this record the unfair labor practices to the extent that the "grossly improbable" testimony shows there were any which vitiated the union majority (which again needed only a change of one vote for any reason to be no longer a majority status) rests squarely on Thornton. There is some reference to Johnson, the assistant manager but the ALJ found him to be completely free of bias. Further, the record shows that Johnson was at the time of the hearing employed in a Safeway store where he was a member of the retail clerk's union, and that he came to the Petaluma store in April 1970 as a second assistant manager, a position of so little supervisory consequence that he was eligible to and did vote in the first Petaluma election. It is patent that Johnson was dominated by Thornton in his position on the union organizational campaign and it appears equally obvious to me that in the absence of Thornton there would have been no unfair labor practices occurring at this store, one of the large chain which according to the record "has labor union agreements . . . all over the country."

It is at this point that we must note that Thornton was transferred to another store soon after his discharge of O'Neil. The majority opinion would dismiss the crucial significance of this as it bears upon the likelihood of there being a free and fair election now at Petaluma by noting that Thornton was transferred not discharged and assistant manager Johnson was not discharged or otherwise disciplined. Neither position lends support to the majority. In the first place, transferring Thornton does in my opinion imply disapproval of his managerial actions. In the second place, and even more significantly, the record shows that Thornton's position with the company at another store is that of registered pharmacist despite his background of having managed several of the company's

stores. With regard to Johnson, as we have previously noted, he had already left Walgreen employment completely by November 1972 and the record just does not support an independent volitional participation in unfair labor practices on his part.

The ALJ, the Board and the majority of the panel hearing this case are willing to find that the conduct was of such gravity and pervasiveness that a bargaining order should be entered. Yet the record clearly belies pervasiveness of such magnitude. Despite the claim that Thornton's conduct destroyed the union majority status, it is uncontradicted that this majority status was based upon the fact that from April 20, 1972 through May 31, 1972, the union held authorization cards from eleven of the employees of the appropriate twenty employee unit, and that the actual vote indicated a change of only one vote. It is no secret that occasionally peace at a place of work is purchased by the signing of an authorization card, the employee doing so being aware (at least in the absence of a *Gissel* order) that he will have the privilege of manifesting his actual desires on the subject in the privacy of the voting booth. Surely conduct pervasive enough to justify a *Gissel* order would have resulted in a somewhat greater exodus of support than that which occurred here.

Finally, the majority opinion, as indicated at the beginning of this dissent, is not unmindful of the repeated direction of this court that the Board should show by analysis (presumably not by conclusionary adjectives) the necessity of a *Gissel* order. The cases from this court are outlined in the majority opinion and need not be repeated here. The majority opinion notes that the Board has not provided us with the requisite analysis. As a matter of fact, the situation was not improved by the Board's brief in this court which disposed of this important issue in two pages of general discussion of the *Gissel* law. The majority, however, while stating that it does not intend to detract from the *Peerless* guidelines, does just that. The reason for not remanding is apparently based on the feeling that the process is time-consuming and inefficient. That a remand would further delay bringing a labor dispute to a final conclusion is not the fault of this court. The remedy is readily available in the hands of the Board as is, indeed, the matter of making the process efficient not only after remand but by simply giving some analytic attention to this question eliminating the necessity of remand altogether.

Under the circumstances of this case as presented to us, it is utterly inconceivable to me that the claimed "unfair labor practices are . . . so likely to have an inevitably lingering effect as to preclude the holding of a fair election," Restaurant Associates Industries, Inc., 194 NLRB 1066 (1972). In my opinion, the record presented to us cries out for denying enforcement of the *Gissel* portion of the order.